**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| DR. TAJ MOHAMMAD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:06-CV-101-JVB |
| | ) | |
| TRUSTEES OF PURDUE UNIVERSITY, | ) | |
| Defendant. | ) | |

**FINDINGS, REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE PURSUANT TO**
**28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on Defendant's Motion for Summary Judgment [DE 24], filed by Defendant Trustees of Purdue University ("Purdue") on July 17, 2007. On February 12, 2008, District Court Judge Joseph S. Van Bokkelen entered an Order [DE 33] referring this matter to the undersigned Magistrate Judge for a report and recommendation on the Motion for Summary Judgment pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). For the following reasons, the Court recommends that the District Court grant the Motion for Summary Judgment.

**PROCEDURAL BACKGROUND**

On August 30, 2005, Mohammad filed his EEOC Charge, alleging discrimination on the basis of his race, religion, and national origin. Mohammad was issued his Notice of Suit Rights on February 16, 2006.

On May 10, 2006, Mohammad filed a Complaint with this Court against Purdue, alleging that Purdue discriminated against him on the basis of his race (Indian-Asian American), national

original (Indian), and religion[1] by terminating his employment in violation of Title VII and by improperly affecting the terms and conditions of his "employment contract" in violation of 42 U.S.C. § 1981.  The Complaint also alleges that Mohammad was "wrongfully" terminated under Indiana law.

On June 5, 2006, Purdue moved to strike the claim in Mohammad's Complaint for punitive damages, Mohammad did not respond, and the Court granted the motion, striking the claim for punitive damages.

On June 5, 2006, Purdue also filed an Answer to the Complaint.

On July 17, 2007, Purdue filed the instant Motion for Summary Judgment and a Memorandum in Support.  On August 15, 2007, Mohammad filed a Memorandum in Opposition, and on September 4, 2007, Purdue filed a Reply in support of summary judgment.

On February 12, 2008, District Court Judge Van Bokkelen issued an Order referring this matter to the undersigned Magistrate Judge for a report and recommendation on the Motion for Summary Judgment pursuant to 28 U.S.C. § 636(b)(1)(B).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

[1] In his brief, Mohammad states that he has brought this action for discrimination based on race and national origin.  He does not state that he is alleging discrimination based on religion.

2

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate– in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law.  In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe. Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  The moving party may discharge its "initial responsibility" by simply "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.  When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id.* at 323, 325; *Green v. Whiteco Indus., Inc*., 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1526 (7th Cir. 1990).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings.  Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).  Rule 56(e) provides that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material

facts; the non-moving party must come forward with specific facts showing that there is a genuine

issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all

facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor

of that party.  *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v.*

*R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  A court's role is not to evaluate the

weight of the evidence, to judge the credibility of the witnesses, or to determine the truth of the

matter, but instead to determine whether there is a genuine issue of triable fact.  *See Anderson*, 447

U.S. at 249-50; *Doe*, 42 F.3d at 443.

No heightened standard of summary judgment exists in employment discrimination cases

nor is there a separate rule of civil procedure governing summary judgment in employment cases.

*Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing

*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)).  However, intent and

credibility are critical issues, frequently found in employment cases, that are genuinely contestable

and not appropriate for a court to decide on summary judgment.  *Id*.  Nevertheless, summary

judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment

discrimination cases.  *Wallace*, 103 F.3d at 1396.

## MATERIAL FACTS

### A.  Dr. Taj Mohammad

Taj Mohammad, Ph.D., was born in India in 1956.  He graduated with a B.Sc.  honors degree

in chemistry from Aligarh Muslim University in India.  Mohammad then graduated in 1977 with a

Masters Degree in organic chemistry from the same university and obtained his Ph.D. in organic

chemistry from Punjab University in India in 1982.  Soon thereafter, Mohammad joined the faculty of Gurunanak Dev University as an assistant professor in Chemistry.  In December 1982, Mohammad moved to Ontario, Canada, and became a postdoctoral fellow at Brock University in St. Catharines.  In 1984, Mohammad joined the University of Saskatchewan also as a postdoctoral fellow in Chemistry.

Mohammad was first employed by Purdue on November 4, 1987, as a postdoctoral research associate in the School of Chemistry.  This was a non-tenure track, full-time appointment. Mohammad held this position until 1990 when he was promoted to senior research associate in Chemistry.  In 1994, Mohammad was promoted to assistant research scientist in Chemistry.  This position was also a regular position with no annual contracts.  Mohammad taught a lab course to undergraduate students in 2000 and 2001.

In May 2001, Mohammad was laid off by the University as a result of a new grant not being funded.  Mohammad was on layoff status for one month, during which time he was given priority by Human Resources in the process of applying for alternate employment on campus.  One of the positions for which he applied was the position of lab manager/coordinator in Purdue's Department of Forestry and Natural Resources.  Mohammad was interviewed by Dr. Dennis LeMaster and Professor Andy Gillespie.  LeMaster was the head of the department and Gillespie was a professor in that department.  LeMaster offered the position to Mohammad.  Initially, Mohammad was to be responsible for about six labs and a green house in three different buildings.  As a lab manager, Mohammad was expected to work with Professors Gillespie, Pope, Swihart, Weeks, Jacobs, and Spacey.  The labs were eventually moved and combined, and Mohammad became the lab manager

5

for the Molecular Tree Physiology Lab ("MTPL") and the Forest Ecology, Soil and Silviculture Lab ("FESSL").

At the time he was hired, Mohammad was given a position description outlining his functions as a lab manager/coordinator, which provided, in pertinent part:

> Coordinate and manage the safe use of six departmental laboratories, greenhouse, and associated scientific equipment, while ensuring they are properly maintained and supplied. Design various methods/protocols pertaining to research. Train and oversee departmental personnel and graduate students in proper and safe methods, techniques and procedures for use of specific pieces of research equipment. Establish, document, and enforce laboratory protocols for the use of equipment and facilities. Conduct laboratory preventive maintenance programs and repair. Facilitate preparation, analysis, and interpretation of research data in collaboration with faculty and students. Assist with procedures and reading results. Suggest use of different instruments to achieve goals. Prepare and maintain a laboratory budget and inventories of laboratory and greenhouse equipment and supplies.

Def. Br., Exh. A. (Mohammad Dep.), Dep. Exh. A. Mohammad testified in his deposition that he recognized the job description and that it was a fair and accurate description of the duties and responsibilities associated with the lab manager job as he understood them when he interviewed for the job. He further testified that he understood that the lab manager job, like the position of senior research associate, carried no tenure.

### B. Mohammad's Supervisors

When Mohammad was hired, LeMaster was Mohammad's supervisor. As head of the department, LeMaster supervised all lab managers, and the lab managers reported to LeMaster. In the Summer of 2004, LeMaster retired and Professor Robert Swihart became interim head of the Department with the same job responsibilities as Le Master.

Previously, Swihart had been a Principal Investigator ("PI") that used one of the labs Mohammad managed and, as such, had interacted with Mohammad. At that time, Mohammad

reported directly to LeMaster.  As a PI, Swihart knew that Mohammad managed other labs and did not demand that Mohammad spend a percentage of his time on Swihart's projects.  As a PI, Swihart did not have any supervisory role over Mohammad and was not aware of any PI with a supervisory role over Mohammad.  Swihart had no problems with Mohammad, was never disrespected by Mohammad, and did not observe Mohammad disrespect anyone.  When Swihart took over as interim head, all lab managers continued to report to him.  Furthermore, based on his experience, Swihart believed that no PI had supervisory control over any lab manager.

When LeMaster left, the MTPL had been created in name only and was just at a point to become functional.  Swihart assigned Mohammad to the MTPL as a lab manager.  Four PIs used the FESSL, namely professors Gillespie, Pope, Parker and Jacobs.  The MTPL was used by Professor Richard Meilan and another faculty member, Bill Chaney, although Chaney was retired.  To Swihart's knowledge, none of the PIs other than Meilan ever had a conflict with Mohammad and none expressed any dissatisfaction with Mohammad's employment.

### C.  Dr. Meilan[2]

Dr. Richard Meilan was hired in October 2003 by Dennis LeMaster as an associate professor of molecular physiology.  LeMaster was Meilan's direct supervisor.  Meilan testified that his position description indicated that he was to work in a supervisory capacity.  Meilan understood that he did not have the authority to fire or discipline Mohammad.  Meilan worked with Mohammad from October 2003 through July 2004 under LeMaster.  There were no recorded complaints by Meilan against Mohammad for job performance or any other issues of concern during that time.

---

[2] Certain facts contained within Mohammad's Statement of Material Facts have been omitted because the evidence cited in support was not submitted to the Court.  For example, pages 35-68, 71-80, and 105-108 of Mohammad's deposition were not submitted to the Court.  To the extent the supporting documentation is found within the material submitted by Purdue, the Court has included those facts.

Meilan has no written record to indicate that Mohammad ever refused to perform any task that he assigned to him.  At some point in his deposition, Meilan testified that when he came from the University of Oregon, he knew that Mohammad was managing at least one other lab.  Much further in his deposition, Meilan testified that once he had been appointed to the department, he did not know what Mohammad's position at the lab was even after speaking to Mohammad.  Furthermore, Meilan testified that he did not believe that Mohammad, rather than Meilan, could decide what equipment could be in the lab.

Soon after LeMaster's retirement, which coincided with the MTPL becoming fully functional, Meilan began requesting that Mohammad perform certain functions that were not contemplated in his job description such as reporting to an individual PI's office (Meilan), preparing solutions, extra duties such as being the Chair of the Hazard Management Committee and a member of the Equipment Committee and the Greenhouse Committee, working on particular projects with faculty, collaborating on research with faculty, and lifting and carrying heavy objects.

Meilan testified that LeMaster verbally told him that fifty percent of Mohammad's time would be spent managing the MTPL.  No documentation exists to confirm this claim.  When asked in his deposition whether Mohammad had done anything to him that he considered offensive since arriving at Purdue University, Meilan testified to the following examples of what he considered to be rude behavior: (1) that one morning, Mohammad turned away when Meilan attempted to greet him and would not acknowledge Meilan's presence; (2) that on one occasion, Mohammad reached across Meilan to grab something from a mailbox; (3) that in the hallways, Mohammad would deliberately go out of his way to avoid eye contact with Meilan; (4) that Mohammad would refuse to acknowledge Meilan in the hallways; and (5) that once Mohammad raised his voice when telling

8

Meilan his permission should be sought when equipment is to be brought into the labs that Mohammad manages.  However, Meilan was unable to remember when any of these incidents occurred.

From the beginning of his appointment, Meilan had concerns about Mohammad's performance, although he did not state them in writing until Swihart took over, after which he sent many emails concerning Mohammad.  In his deposition, Meilan explained that on numerous occasions, Meilan's emails to Mohammad went unanswered or Mohammad refused to go to Meilan's office to meet with him.  The remainder of Meilan's complaints to Swihart regarding his relationship with Mohammad and Mohammad's performance as lab manager are set forth below in Parts D and E, which outline the numerous emails exchanged on this subject and Swihart's discipline of Mohammad.

## D.  The Emails

A series of email exchanges between Meilan, Mohammad, Swihart and others concerning Mohammad took place over the course of many months in 2004.  These email exchanges provide much of the basis of Mohammad's claims of discrimination and, thus, are summarized here.

On July 29, 2004, Mohammad sent an email to try to set up an appointment with Meilan for a DNA extraction project.  Meilan responded and proposed a time.  Mohammad responded that he had a conflict with Meilan's proposed time and proposed meeting earlier or later the same day.  Meilan indicated he could not meet earlier but proposed a time in the afternoon.  Mohammad accepted that time.  A few minutes later, Meilan emailed that something had come up and asked if they could meet anytime a day earlier.

On August 6, 2004, Mohamed sent an email advising Meilan that, while setting up some equipment in the lab, he had required technical assistance by phone, which required a prepayment of $95 to the company providing the assistance.  Meilan responded by thanking Mohammad, expressing surprise that Mohammad was charged $95 for technical advice, inquiring as to what account the fee was charged to, and asking whether Mohammad got Swihart to pay the fee.

On August 27, 2004, Meilan identified Mohammad as a lab manager in an email to Swihart. In the same email, Meilan complained that Mohammad had rearranged some equipment in the lab that Meilan had already set up, which Meilan believed was an effort by Mohammad to make it look like he had been accomplishing something.  Meilan compared Mohammad's action to "rearranging the chairs on the deck of the titanic."  Pl. Br., Exh. 4, p. 4.

On August 30, 2004, Meilan sent an email to Mohammad, instructing him to perform certain tasks.  In addition, Meilan discussed his purchase of liquid nitrogen from a chemical store for a project and indicated that he was unable to pick up the liquid nitrogen.  He indicated in the email that the container for the liquid nitrogen was inside the door of his lab and gave the time that the store would be able to fill the tank.  Mohammad responded that he would bring liquid nitrogen sometime tomorrow and asked if Meilan had a truck to haul the tank.  Mohammad also indicated that he would give high priority to the other listed tasks.  Meilan responded by email, asking if Mohammad could use a departmental truck.  Mohammad sent another email in which he described to Meilan the procedure for picking up the liquid nitrogen, indicated the account number that Meilan would need to refill the tank, and explained that as lab manager, he generally sent the orders in for supplies and then either a student or a technician would pick the items up if they were not deliverable by the store.  Meilan sent an email the next day indicating that he had hoped Mohammad

could go have the container filled himself to save Meilan time and that Meilan would now have to do it before his afternoon seminar.  In his deposition, Meilan testified that, by sending the original email, he wanted Mohammad to pick up the liquid nitrogen.  Meilan also testified that he did not know whether Mohammad had ever been told that Meilan was Mohammad's supervisor.

On August 31, 2004, Swihart sent Meilan an email applauding his diplomacy regarding the liquid nitrogen.  Swihart told Meilan to instruct Mohammad to continue to pick up the liquid nitrogen until one of the students was licensed to drive or until the department would be able to dispense their own liquid nitrogen, which would be happening soon.

On September 3, 2004, Meilan sent an email to Swihart explaining that he had met with Mohammad to discuss lab management tasks Meilan would like Mohammad to undertake and Mohammad informed him that he would not install or maintain any shared, departmental equipment of which he was not involved with the purchase and that he would not make stock solutions.  Meilan queried whether Swihart thought either of these expectations was unreasonable, and Swihart responded that he did not think either was unreasonable.

Mohammad testified in his deposition that, on September 4, 2004, Meilan came late to a meeting that he scheduled with Mohammad in the MTPL.  Meilan indicated a pH meter and image analysis system and instructed Mohammad to set them up.  Mohammad agreed to do so. Mohammad further testified that he then pointed out that, in the future, he should be consulted when equipment is brought into the lab in order to make space.  Meilan responded that it was his lab, his money, and that if Mohammad did not do as he said, Meilan would "get" Mohammad.  Pl. Br., Exh. 1 (Mohammad Dep.), p. 112.

11

On September 7, 2004, Swihart sent an email to Meilan, directing him to speak to Marcia Kremer, another lab manager in the department, to determine whether Meilan's demands of Mohammad were consistent with the duties of a lab manager.  Meilan did not speak with Kremer but rather testified that he spoke with one Charles Michler about the role of the manager in her lab. Michler responded to Meilan's inquiry as to whether Kremer is expected to make stock solutions in the affirmative: "Marcia will make buffers that (almost) everyone will use.  In addition, she will autoclave tips and run standards on the gene sequencers.  I will remind you that most of the equipment that [Mohammad] maintains in the [FESSL] is mine.  His part in purchasing any equipment at all has been minimal." Pl. Br., Exh. 4, p. 9.

On September 7, 2004, Swihart sent an email to Meilan, stating that he spoke to Jacobs and Gillespie. Swihart's email stated as follows:

> I have spoken with Doug and Andy. They allow [Mohammad] to pretty much do as he pleases and seem satisfied as long as he assists their graduate students when needed. So the situation you have presented, although much more in keeping with my limited experiences with lab operations, is decidedly different. [Mohammad] needs to realize that managing the two labs will require an adjustment on his part to accommodate the PI's with different styles and expectations. I am happy to relay that message to him. Of course there is no way of me doing so without [Mohammad] knowing that I have spoken to the three PI's involved. An alternative is for you, Doug and Andy to meet with [Mohammad]. I am in favor of whichever you believe will be most effective in establishing a good working relationship for all involved. Regardless, he needs to understand that his refusal to respond to reasonable requests such as the ones you have made, is unacceptable. I suspect that the former may be the most effective route to convey in this message. But you ultimately are the functional supervisor and person who will be interacting with him so I would like your thoughts.

Pl. Br., Exh. 2 (Meilan Dep.), pp. 74-75; Exh. 4, p. 10.  Meilan responded by asking Swihart to communicate to Mohammad this situation and to reaffirm with Mohammad that the PIs serve as his "functional supervisor[s]."  Pl. Br., Exh. 4, p.10.

Meilan testified that Swihart delegated his supervisory responsibilities to the PIs because he was unfamiliar with the needs of the labs.  Meilan believed that Dean Randy Woodson changed the supervisory responsibilities to make lab mangers report to PIs, but he was not aware of any document that explained this change in power structure or when this alleged change was made.

On September 13, 2004, Mohammad emailed Meilan to advise him of certain equipment that was ordered for the lab.  In an email response on September 14, 2004, Meilan expressed concern over spending money for equipment that he did not need, but, also recognizing the importance of having a spare as suggested by Mohammad, he indicated that he was inclined to allow the purchase. He asked that Mohammad provide him with the name of the supplier, catalog number and the cost of each unit before placing the order.

On September 17, 2004, Meilan emailed Mohammad, asking if he had received a message Meilan had sent two days earlier.  Mohammad's email response explained that he had been out of the office but that he had the list of tasks that Meilan had sent and that he had started working on the list. Mohammad further requested that Meilan inform him if anything needed higher priority. On September 20, 2004, Meilan sent an email response giving Mohammad an updated list of tasks and requested that Mohammad meet with him weekly in Meilan's office to discuss progress and any problems that may arise.

During an email exchange on September 14, 2004, regarding the purchase of latex gloves, Mohammad wrote, "I buy both items from the University Stores. . . . if you need these supplies immediately, I'll allow you to use them from the PFEN G041 lab which I supervise, too."  Pl. Br., Exh. 4, p. 26.  Meilan responded, "I am a little confused by the wording of your message.  Were you intending to put the word "will" between "I" and "buy"?  Thus, I am not sure if you are intending

13

to make the purchase or not.  I have not purchased these items and would like you to do so." *Id*.

Mohammad replied, "Sorry for the confusion owing to my poor English!  I used "buy" as a

composite verb for present and future sentence.  For your clarification, I'LL PLACE THE ORDER

FOR GLOVES and NaOH."  *Id.* (emphasis in original).  Meilan responded, "Thanks for the

clarification.  I just wanted to be sure that you understood that I had not ordered these items yet."

*Id*.

On September 20, 2004, Mohammed emailed Meilan, stating that Meilan had removed "do

not disturb" notes on benches and rearranged things in the lab.  Mohammad indicated that if Meilan

would like the lab arranged in a certain way, Mohammad would do that.  Mohammad also asked

Meilan not to send uncertified persons with chemicals to the lab because in the event of an accident,

the person and the department would be at risk.  Meilan denied throwing away the notes but asked

Mohammad to consult with him on the organization of the lab, which needed to be organized in

ways that differ from standard labs.  Meilan also asked Mohammad to identify who Meilan had sent

to the lab that was not certified.  Mohammad emailed that he had experience working in a variety

of labs, including molecular biology labs, and knew something about their setup, but that again, he

had no problem in arranging the lab according to Meilan's needs.  He also identified the individuals

who had brought chemicals to the lab.  Meilan finally responded that the lab organization was one

of the things he hoped to discuss during their weekly meetings.  He also responded regarding the

identified individuals.

On the same day, Meilan claimed in an email to Jacobs and Gillespie that LeMaster had

indicated that he was entitled to fifty percent of Mohammad's time.  Furthermore, Meilan suggested

that Swihart had begun to enforce this arrangement and wanted to know how much time Mohammad

14

spent on projects for these other PIs. Jacobs wrote back that his arrangement with Mohammad was informal and that he was not aware that he was entitled to direct a portion of Mohammad's time until Meilan brought that up. Jacobs noted that, "I still see [Mohammad's] tasks consisting primarily of maintaining our shared equipment and offering trouble-shooting assistance for my lab staff." Pl. Br., Exh. 2 (Meilan Dep.), p. 86. Gillespie on the other hand, wrote, "Surprise [Meilan], [LeMaster] often made promises to new faculty that either could not be kept or significantly impacted others if they were. However, with [Mohammad], there is probably the ability to have him troubleshoot both labs. His job is essentially to maintain equipment, train students on equipment, help purchase new equipment, allocate lab space as needed, and maintain the safety aspects of the labs . . . . He reports to [Swihart] who can decide on how to allocate his time." Pl. Br., Exh. 4, p. 15.

On September 20, 2004, Mohammad advised all members of the faculty using the labs he managed that he would be available to meet in his office concerning lab issues during a time slot designated by Mohammad. Meilan agreed with Mohammad's proposal but still requested that Mohammad meet in Meilan's office each week to provide an oral progress report describing the work Mohammad had accomplished in the lab and asked Mohammad to indicate a time that was convenient for him to do that. On September 24, 2004, Meilan emailed Swihart a copy of the email to Mohammad and inquired (1) whether it was a reasonable request and (2) how long Meilan should wait before sending a follow-up message to Mohammad.

On October 5, 2004, Mohammad wrote that he respectfully disagreed that he should make an exception for Meilan, but that if the consultation time set by Mohammad does not fit into Meilan's schedule, then he would be happy to arrange another time to meet with Meilan in Mohammad's office. Meilan did not immediately respond. Meilan forwarded Mohammad's

correspondence to Swihart referring to Mohammad's October 5, 2004 response as "belated."  In response, Swihart sent Meilan an email telling him to pick a day, time, and place to meet with Mohammad and to "provide no options" and "use no interrogatives."  Pl. Br., Exh. 2 (Meilan's Dep.), pp. 125-26.

On October 6, 2004, Meilan wrote in an email, "[Mohammad], I consider my request for a weekly meeting with you in my office to be reasonable.  You seem to be unwilling to select a time for us to do this, so I will do this all myself.  I would like you to come to my office next Tuesday the 12th of October at 10:00 a.m. for us to discuss your recent accomplishments in my lab." Pl. Br., Exh. 2 (Meilan's Dep.), p. 127.

On October 13, 2004, Meilan asked Mohammad to obtain 20 pounds of dry ice from a store before Meilan departed for the field.  Mohammad agreed to bring the dry ice the following day.

In another series of emails on October 14 and 15, 2004, Mohammad mostly responded to Meilan's emails.

On October 13, 2004, a graduate student requested by email that Mohammad order some PCR reagents.  On October 19, 2004, the student contacted Meilan to report that he had contacted Mohammad again on October 18, 2004, and that he was still waiting for the reagents.  About an hour later, Meilan forwarded the email to Swihart with a note indicating that Mohammad had failed to fulfill the student's request.  Meilan did not recall whether he had consulted with Mohammad to determine whether there was any problem with the student's request.

October 21, 2004, Meilan inquired whether Mohammad had established an inventory for the chemicals stored in PFEN158.  Mohammad responded on the same day, explaining that he had the list of chemicals he possessed as well as the reagents others bought to finish up the inventory; he

also indicated that he often uses summer or undergraduate students to assist with updating the list. Meilan wrote back and told Mohammad that he did not have money to pay for students and instructed Mohammad to put together the inventory list himself, which Meilan opined to be a fairly easy task.  In the exchange, there was some disagreement about whether Mohammad had actually asked for student help for this project and whether Meilan had actually said that he did not have money to hire students.  Meilan testified that Mohammad had not indicated to him that he was paying the undergraduate students to help him.  On October 25, 2004, Mohammad sent Meilan an email that he had put together the inventory list.  Meilan forwarded the email to Swihart and wrote, "Well, that occurred a lot faster than had been projected."  Pl. Br., Exh. 2 (Meilan Dep.), pp. 156-57.

On October 25, 2004, Meilan sent an email to Swihart entitled "[Mohammad]'s list of accomplishments."  Pl. Br., Exh. 4, p. 43.  Mohammad provided a list of at least 60 items that he worked on based on Meilan's demands.  Meilan then sent Swihart an email, writing, "Quite frankly [Mohammad] should have been embarrassed to include many of the entries.  It probably took him longer to type many of them out than to actually perform the task."  *Id*.  Meilan testified that he did not know how much time Mohammad spent to accomplish these 60 tasks. In the email, Meilan referred to Mohammad's work as "pure fluff."  *Id*.

On October 27, 2004, Mohammad received an email from a student concerning an order the student had placed for glycerol; the email was copied to Meilan.  In the email, the student wrote, "Sorry to trouble you.  I do not know what's going on with my Glycerol.  It's been a long time from the day I wrote down on the board."  The student also indicated other reagents and supplies that were needed.  An hour later, Meilan copied the email to Swihart indicating, "This is yet another example of what is not getting done in my lab."  Pl. Br., Exh. 4, p. 45.

17

On October 28, 2004, Mohammad and Meilan exchanged a series of emails concerning an instrument dubbed Orion SA520 pH meter.  Meilan responded that he was given that pH meter by Michler and that it did not come with any documentation.  Mohammad indicated that there was an error code that he wanted to decipher to troubleshoot the problem.  Meilan responded by thanking Mohammad for looking into the error but asked Mohammad to give a different task higher priority.  Mohammad wrote back on the same day, indicating that he would take care of the higher priority task.

Although he testified that there were lots of emails Mohammad did not respond to, Meilan was unable to produce examples of any such emails.

On November 1, 2004, Mohammad sent an email thanking Meilan for finding a screw somewhere.  Mohammad then indicated that he intended to order a basic tool set for the lab.  Meilan responded, asking Mohammad not to order any tools until he talked to him because Meilan had an extensive tool collection at home and intended to donate duplicate tools to the MTPL.  Mohammad emailed that it was "great" that Meilan was donating tools.  Pl. Br., Exh. 4, p. 51.

On November 5, 2004, Mohammad sent Meilan an email in response to an apparently renewed request by Meilan for Mohammad to meet with him in Meilan's office.  Mohammad included a copy of the text of the October 5, 2005 email in which Mohammad disagreed that he should make an exception for Meilan.  Mohammad further agreed to arrange a different time for Meilan to meet with him in Mohammad's office.  Mohammad copied Swihart on the email.

The same day, Meilan forwarded the email to Swihart and wrote, "As you can see from [Mohammad's] message below, he is refusing to come to my office to provide me with an update on progress he has made on projects in my lab, and to discuss orders that need to be placed.  This

is clear violation of the first condition you specified in his final letter of reprimand.  I interpret this as insubordination and grounds for dismissal."  Pl. Br., Exh. 4, p. 52.

On November 5, 2004, Mohammad sent an email to all of the PIs, including Meilan, notifying them that he would be in Lincoln, Nebraska, the following week from Monday through Thursday to attend a training workshop for an infrared gas analyzer that Jacobs had purchased.  Soon thereafter, Meilan sent an email to Jacobs asking (1) if Jacobs had asked Mohammad to attend the training or whether Mohammad volunteered; (2) whether it was necessary for Mohammad to attend the training; (3) who was paying for Mohammad's trip; and (4) how long the workshop would last.  Jacobs answered all of Meilan's questions and indicated that it made sense for Mohammad, as lab manager, to attend the training.

On November 6, 2004, Meilan sent an email to Swihart, "[Mohammad] was obviously disseminating some misinformation." When asked to describe the misinformation, Meilan indicated that Mohammad had requested that orders for the lab should be placed well in advance.  Because Meilan believed that orders can be placed a lot faster than Mohammad was indicating, he believed Mohammad's representations to be "misinformation."  Pl. Br., Exh. 2 (Meilan Dep.), pp. 184-85.

On November 8, 2004, Swihart responded that he wanted to speak with Meilan because he believed that he understood why there was conflict with Mohammad.  Meilan testified that Swihart told him that Mohammad was unhappy that, shortly after Meilan had arrived, Meilan had referred to Mohammad on a document as a "technician" rather than a lab manager.  *Id.* at 185-187.  Meilan explained that the document on which he described Mohammad as a technician was drafted shortly after he arrived at Purdue University and that, at his previous employment, they did not distinguish between technicians and lab managers.

19

That same day, on November 8, 2004, Meilan sent Swihart an email following a meeting with students during which the students reported that Mohammad told them that he would not order anything listed on the white board or requested verbally and that he would only take orders by email that included the catalog number and the name of the supplier.  In his email, Meilan indicated the problems he had with this arrangement, specifically that the new arrangement had not been communicated to all of the students, that there were items listed on the board for over a month that still had not been ordered, and that Mohammad would have a better idea of where to order the items than students, especially international students.  Most of the students were Ph.D. candidates with computers and internet access.

On November 8, 2004, Meilan sent an email to Swihart indicating that Mohammad's earlier email of November 5, 2004, that he would be out from Monday through Thursday in Nebraska was "a bit misleading" because Meilan saw Mohammad in the building at approximately 8:00 a.m. on Monday.  Pl. Br., Exh. 4, p. 56.

On November 10, 2004, Swihart wrote to Jacobs, Gillespie, and Meilan to inquire about who would be responsible for the on-campus greenhouses.   Jacobs wrote back to indicate that Mohammad should be responsible for the campus greenhouses because there was nowhere else to shift the responsibility.   Meilan responded by email that he did not believe that "having [Mohammad] oversee the greenhouses at Martle is a good idea.  I think it should go to someone who already spends a lot of time out there to avoid unnecessary trips and is familiar with the setup. Martel is a research forest that's 7.5 miles west of town."  *Id.* at 195-200.  Swihart agreed with Meilan.

20

In November 2004, the PIs and Swihart discussed reassessing the position of lab manager. Meilan suggested that a BS with three years of equivalent experience would be sufficient. Gillespie responded that "we need to make sure our labs are up to par and [Mohammad] serves that role." Pl. BR., Exh. 2 (Meilan's Dep.), p. 204. Gillespie also wrote, "[Mohammad], or any lab manager oversees a lab and its operation. They are not research technicians." *Id.* at 204. At the time, Mohammad was the only lab manager who possessed a Ph.D.

On December 16, 2004, Meilan sent a message to his wife on university property referring to Mohammad as a "petty little man." *Id.* at p. 211. In the back and forth with his wife, Meilan claimed to have received equipment from "Paula's technician" while "[Mohammad] was on vacation," highlighting the word "vacation." *Id.* In his deposition, Meilan explained that he was referencing a complaint by Mohammad that Meilan was bringing equipment into the lab without his prior knowledge but that the equipment was offered to Meilan while Mohammad was on vacation so Meilan could not ask Mohammad for permission to put it in the lab. But for a typing inadvertence that caused Meilan to copy Mohammad on the email, Mohammad would not have known about the email.

### E.  Mohammad's 2004 Disciplinary Record in the Department of Forestry and Natural Resources

Swihart met with Mohammad twice in the Summer of 2004, in July and August, to discuss Mohammad's performance. The first meeting was part of a series of "listening sessions" Swihart was conducing with all faculty and staff in the department. At this meeting, Swihart informed Mohammad that he was expected to split his time between the FESSL and the MTPL, which Mohammad said he did not know. Swihart confirmed that LeMaster had personally told Swihart that this was the apportionment of Mohammad's responsibilities. During the second meeting, which

21

was held with Swihart, Meilan, and Mohammad, Swihart again reiterated that Mohammad's time be apportioned equally between the two labs.  He articulated other performance expectations of Mohammad, including open communications with PIs regarding the labs, responsiveness to the needs of PIs, and fostering a collegial and supportive work environment for everyone.  Swihart suggested that Mohammad and Meilan meet regularly to address the needs of the programs associated with MTPL.  Mohammad agreed to work closely with Meilan to make his laboratory operation function smoothly.  Meilan also agreed to send Mohammad a list of management tasks needed to be completed for MTPL, which was sent on August 30, 2004.

When problems persisted between Meilan and Mohammad, Swihart again met with Mohammad on September 14, 2004, to discuss his performance.  Swihart emphasized that it was Mohammad's responsibility to work with Meilan, to cooperate with Meilan's requests, and to be responsive to his needs.  Mohammad indicated a willingness to work toward these goals. Mohammad reported to Swihart that Meilan referred to him as and treated him like a technician. Meilan had posted Mohammad's name on the lab door as a technician.  At the meeting, Swihart told Mohammad to comply with Meilan's directives.  Mohammad told Swihart that it was hard to run two labs with different sets of principles because he was treated as a technician in one and a lab manager in the other.

In his deposition, Swihart testified that Mohammad (1) was unwilling to place orders that were written on the white board; (2) did not respond in a timely manner to repeated requests to either set up equipment or troubleshoot equipment; and (3) did not respond to the need of the MTPL to have competent cells.  Swihart testified that these were not his personal observations but were reported to him by Meilan and confirmed by graduate students.  Although email records show

Meilan lodging these complaints against Mohammad, the only documentary evidence substantiating a complaint by a student is the October 19, 2004 email from a graduate student whose order sent by email had not been filled by Mohammad.  Swihart did not recall receiving any email from Meilan or others complaining that Mohammad refused to place orders recorded on a white board at MTPL.

On October 1, 2004, Swihart issued a "Written Reprimand–Improper Behavior" to Mohammad, citing Mohammad's failure to improve his performance as previously discussed by Swihart and Mohammad.  The reprimand stated that it was a warning and an opportunity for Mohammad to correct his lack of cooperation and poor behavior toward Meilan.  A list of ten projects for the MTPL was attached to the reprimand.  The written reprimand did not indicate that any person other than Meilan had lodged a complaint against Mohammad.  The reprimand further warned that a failure to improve his performance could subject Mohammad to further and more severe disciplinary action, including suspension or termination of his employment with the University.  A meeting for October 22, 2004, was scheduled to review his progress and discuss these concerns.

In this written reprimand, Swihart suggested that Mohammad refused to fulfill essentials to Meilan's program. When asked in his deposition to describe such essential tasks, Swihart stated, (1) weekly meetings regarding laboratory operations; (2) failure to comply with requests to prepare stock solutions; (3) issues with laboratory arrangement; and (4) behavioral issues.  Swihart testified that he did not recall whether he had any written document indicating that Mohammad should report on a weekly basis to Meilan. Swihart testified that he never received a complaint from the other three PIs against Mohammad; he also indicated that two of the three other PIs were essentially

inactive with no demands on Mohammad's time, and the third PI hade relatively low demands. The only PI that lodged complaints against Mohammad was Meilan.

This written reprimand also indicated that Mohammad had been rude to Meilan. When asked in his deposition to cite examples of such rudeness, Swihart testified that there was at least one incident in a hallway when Meilan said "hi" to Mohammad but Mohammad completely turned toward the wall and did not acknowledge Meilan. The incident did not occur in the lab, and Meilan was not asking Mohammad about any issues relating to the lab. No other PI or student reported any rudeness by Mohammad. Concerning organization of the lab, Swihart vaguely remembered one email Meilan sent regarding a disagreement with Mohammad addressing the set up of equipment in the lab.

Around October 22, 2004, Mohammad met with Swihart and denied that he refused to respond to Meilan's request for meetings. Mohammad denied that he was rude to Meilan and that he resisted accommodating Meilan's organizational and procedural expectations.

On October 25, 2004, Swihart issued a "Final Warning" to Mohammad. The warning outlines Mohammad's performance deficiencies, including failing to work in a cooperative manner, failing to cooperate with multiple requests by Meilan to meet with him on a regular basis to review and plan lab activities because Mohammad "could not make an exception" to his current office hours, routinely failing to respond to emails from Meilan, and providing vague responses when questioned about his achievements regarding polymerase chain reaction procedures. The warning further explains that, as a result of Mohammad's poor communication, the ability of Meilan's students to place orders was compromised. Swihart determined that Mohammad had failed to adequately progress toward meeting the performance objectives enumerated in the October 1, 2004

24

reprimand.  Swihart then outlined eight specific performance objectives that Mohammad was required to meet by November 3, including to set up or implement various laboratory procedures, establish and attend two weekly meetings with Meilan, and organize certain aspects of the lab.  The letter warned of the possibility of discipline or termination for a failure to comply.

When asked to explain what aspect of Mohammad's behavior needed improvement, Swihart stated in his deposition that it was Mohammad's unwillingness to: (1) meet Meilan; (2) respond to requests for orders; (3) fix equipment or addressing equipment needs; and (4) prepare competent cells.  Swihart admitted that Mohammad did order equipment for the lab.  Furthermore, Mohammad set up a protocol to request orders requiring students to place orders by email, and Swihart testified that he had no evidence that Mohammad refused to complete orders sent to him by students via email.  Swihart did not recall whether Meilan told him that there were numerous email exchanges between him and Mohammad for the period under review.  The last item on the list in the warning was that Mohammad should "troubleshoot the old pH meter in the lab."  Swihart did not recall being told by Meilan that Mohammad was in the process of troubleshooting the pH meter but was halted by Meilan.  Swihart did not recall meeting with Mohammad on November 3, 2004.

On November 4, 2004, Mohammad provided a detailed response to Swihart's October 25, 2004 warning.  Concerning meetings with Meilan, Mohammad wrote, "I repeated that if this time does not suit to Dr. Meilan, I can arrange for him any other time in my office, including evenings and weekends."  Pl. Br., Exh. 3 (Swihart Dep.), p. 93.  In his deposition, Swihart opined that the problem regarding meeting appears to have been the venue for such meeting and that Mohammad would only meet in his own office.  Swihart did not know whether Meilan met with Mohammad in Mohammad's office.

On November 12, 2004, Swihart issued an "Extension of Final Warning" to Mohammad, noting that Mohammad had achieved two of the organization goals, had made progress toward solving one of the goals of trouble-shooting a piece of equipment, and needed improvement in three areas, which were establishing and attending two weekly meetings with Meilan, openly communicating with Meilan as well as exhibiting initiative in managing the laboratory operations, and implementing one of the laboratory procedures and protocol.  Swihart wrote:

> As was emphasized in the written reprimand, you are obligated to be responsive to Dr. Rick Meilan's requests related to his laboratory and to work in a cooperative manner to ensure an efficient and productive laboratory environment.  These are expectations and are not negotiable.  When asked about your failure to comply with Dr. Meilan's multiple requests to meet with him on a regular basis to review and plan lab activities, you indicated that you "could not make an exception" to your current schedule of office hours.  You routinely have failed to respond to emails from Dr. Meilan.  The failure to meet with Dr. Meilan has compromised the ability of his student's[sic] to have orders placed in a timely fashion.

Def. Br., Exh. B (Swihart Dep.), Dep. Exh. 9.  Swihart directed that they would meet again in mid-December to review Mohammad's progress and noted that a "[f]ailure to meet these expectations could lead to further and more severe discipline up to and including termination of your employment with the University."  *Id*.  At his deposition, Swihart did not recall that he met with Mohammad in December 2004.  Swihart testified that he sent an email to Mohammad on December 16, 2004, that Mohammad was to comply with the creation of the competent cells and DNA markers.  When Mohammad was given the task to make competent cells in December 2004, he had not received training in making those cells, although he been given opportunities to receive the training from Kremer.

Mohammad acknowledged in his deposition that he took no steps to improve his communication with Meilan:

Q: You understood . . . that Dr. Swihart wanted you to improve your communication,
believed that you needed to improve your communication with Dr. Meilan?
A: He believe[d].
Q: He believed that?  Your department head believed that, and you didn't do
anything differently after you received the final warning, correct?
A:  No, I did not.

Def. Br., Exh. A (Mohammad Dep.), p. 132.  Mohammad further testified that he did not establish

and attend weekly meetings with Meilan between October 25 and November 3 as required.

On January 7, 2005, Swihart sent an email to the PIs indicating his decision to terminate

Mohammad's employment because Mohammad was not collegial to Meilan and because

Mohammad refused to perform tasks requested by Swihart.  In his deposition, Swihart did not recall

receiving any complaints from Meilan indicating that Mohammad had not been collegial to him from

the time of the extension of the final warning in November 2004 through the date of Mohammad's

termination.  In terms of performance, Swihart testified that Mohammad did not maintain the pH

meter although Swihart previously commended Mohammad for making progress in that area.

Furthermore, Swihart testified that Mohammad failed to maintain chemical reagents.  Swihart did

not recall whether Mohammad refused to make the competent cells or DNA standards.  Swihart

testified that he may have asked lab managers other than Mohammad to report to PIs; however,

Swihart did not recall which lab manager or when that occurred, and it was not in writing.

Mohammad was the only lab manager Swihart required in writing to report to a PI on a weekly

basis.

On January 7, 2005, Swihart terminated Mohammad's employment by written letter, stating

that it was due to his unwillingness to address assignments discussed in email correspondence of

November 30, and December 16, 2004, and in the meetings of October 25, and November 12, 2004.

27

Mohammad filed a grievance with the University regarding the termination of his employment. In a January 10, 2005 email to Swihart requesting reconsideration of his termination, Mohammad explained that he had not been able to commit more time to Meilan's projects because he was concerned about the time allotted to the other professors with which he worked, that he had more than seventeen years of committed service to the University, and that because he had not had any such difficulties in the past, he may not have appreciated the seriousness of the situation and thus may not have handled it appropriately. During the grievance process, Mohammad did not suggest that his race, national origin, or religion played any part in Swihart's decision to terminate his employment.

Mohammad's termination was upheld by Randy Woodson, Dean of the College of Agriculture. The Human Resources Grievance Committee was also appointed to hear Mohammad's grievance. The President of the University upheld Mohammad's termination.

In his deposition, Mohammad testified that the basis for his claims of discrimination is that none of the other lab managers were treated as he was and none of them were Muslim or non-American. Mohammad testified that he believed that he was subject to discriminatory conduct, intimidation, and ridicule with menial and demeaning tasks. Mohammad explained that Swihart told him that LeMaster had indicated that Mohammad was to work with Meilan as a technician because he was underutilized, that he was asked to bring liquid nitrogen and dry ice from outside stores, that he was asked to take a graduate course relevant to Meilan's research, that he was asked to certify labs for which he was not responsible, and that apparently Swihart was not responsive to Mohammad describing work that he was doing for another professor. Mohammad felt that being asked to lift heavy weight was demeaning if it was not part of the job description.

Mohammad testified in his deposition that he has no direct evidence that Swihart or Meilan are biased against Indians or Muslims.  There were four other lab managers in the department during Mohammad's employment.  None of the other lab managers were Muslim or of Indiana origin.

Marcia Kremer is one of the lab managers to whom Mohammad compares himself.   She is a white female and is of American national origin.  Kremer stated that she considered the PIs to be her supervisors because she did not deal with Swihart on a daily basis.  Marcia Kremer stated in her recorded statement that she was the chair of the hazard committee for the department.  Kremer stated that she received instructions from PIs to run errands for them such as getting liquid nitrogen, although they used small barrels.  She stated that she would sometimes ask graduate students to get the liquid nitrogen for her.

## ANALYSIS

In the Motion for Summary Judgment, Purdue seeks an entry of judgment in its favor on each of Dr. Mohammad's claims as expressed in his Complaint.  Specifically, Purdue seeks entry of judgment on Dr. Mohammad's claims of race, national origin, and religious discrimination under Title VII; discrimination in employment under 42 U.S.C. § 1981; and wrongful termination under Indiana law.  In response, Dr. Mohammad argues that he is able to satisfy his burden of proof under the McDonnell Douglas burden shifting test for his claims of discrimination under Title VII and § 1981.  Dr. Mohammad does not respond to the motion for summary judgment on his state law wrongful termination claim.  The Court will consider each of Dr. Mohammad's claims in turn.

### A.  42 U.S.C. § 1981

In its Motion for Summary Judgment, Purdue argues that it is entitled to an entry of judgment as a matter of law on Mohammad's claims for damages under 42 U.S.C. § 1981 because, as an

instrumentality of the State of Indiana, Purdue enjoys the state's immunity under the Eleventh

Amendment. The Seventh Circuit has held generally that "state universities are entities of the state"

for the purposes of civil rights analysis and "[n]o cognizable claim under the civil rights statutes can

be brought against the state, because it is not a 'person for purposes of those provisions.'"

*Williamson v. Indiana Univ.*, 345 F.3d 459, 463 (7th Cir. 2003) (discussing immunity in the context

of a claim brought under 42 U.S.C. § 1983) (citing cases). More specifically, the Seventh Circuit

has held that Purdue is an instrumentality of the State of Indiana and thus enjoys the full measure

of the state's immunity under the Eleventh Amendment. *Kashani v. Purdue Univ.*, 813 F.2d 843,

845 (7th Cir. 1987), *cert. denied*, 484 U.S. 846 (1987). In the context of claims brought under 42

U.S.C. § 1983, the Seventh Circuit has held that, as a matter of law, Purdue is an arm of the state

entitled to Eleventh Amendment immunity. *See Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d

620, 632 (7th Cir. 2006); *Kashani*, 813 F.2d at 848. Like with § 1983 claims, Congress did not

abrogate states' Eleventh Amendment immunity when passing 42 U.S.C. § 1981. *See Rucker v.*

*Higher Educational Aids Bd.*, 669 F.2d 1179, 1184 (7th Cir. 1982) (dismissing § 1983 and § 1981

claims against state agency on the basis of state sovereign immunity as embodied in the Eleventh

Amendment). Accordingly, Mohammad cannot recover against Purdue under 42 U.S.C. § 1981, and

the Court recommends that the District Court grant summary judgment in favor of Purdue on this

claim.

### B.  State Law Wrongful Termination

In his Complaint, Mohammad alleges that he was wrongfully terminated under Indiana state

law as a result of "voicing his concerns" regarding "alleged" misrepresentations in a patent

application investigation. Purdue moves for summary judgment on this claim on the basis that

Mohammad has not complied with the Indiana Tort Claims Act.  Mohammad does not address this claim in his response brief.

A claim asserting wrongful termination or discharge by an employee of a political subdivision is a tort claim subject to Indiana's Tort Claims Act ("ITCA").  *See Holtz v. Bd. of Comm'rs*, 560 N.E.2d 645 (Ind. 1990); *Burke v. Bd. of Dirs.*, 709 N.E.2d 1036, 1041-42 (Ind. Ct. App. 1999).  The ITCA expressly defines a state educational institution as a political subdivision. *See* Ind. Code § 34-6-2-110(7).  Purdue University is a state educational institution as defined under the Indiana Code.  *See* Ind. Code § 21-17-13-32.  Under the ITCA, a tort claim is barred unless notice of the claim is filed with the governing body of the political subdivision within 180 days after the loss occurs.  *See* Ind. Code § 34-13-3-8.  The governing body of Purdue University is The Trustees of Purdue University.  *See* Ind. Code § 21-12-23-3.  There is no evidence of record that Mohammad filed a claim with The Trustees of Purdue University.  It is Mohammad's burden to prove compliance with the notice provisions of the ITCA, *see Polick v. Indiana Department of Highways*, 650 N.E.2d 331 (Ind. Ct. App. 1995), and Mohammad has not met his burden.

Accordingly, the Court finds that Mohammad has not filed a notice with The Trustees of Purdue University as required by the ITCA, and the Court recommends that the District Court grant summary judgment in favor of Purdue on Mohammad's state law claims.

### C. Title VII

Mohammad's Complaint alleges that Purdue discriminated against him based on his race (Asian), national origin (Indian), and religion(Muslim) by terminating his employment as a lab manager.  In its Motion for Summary Judgment, Purdue argues that Mohammad cannot establish a prima facie case of discrimination, but that, even if he could, Purdue has articulated a legitimate,

non-discriminatory reason for his termination and Mohammad cannot demonstrate that the reason is a pretext for discrimination.

Title VII prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer . . . to discharge any individual because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).   To prove a case of discrimination under Title VII, a plaintiff must offer either direct or indirect evidence of discrimination. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005).  Regardless of the method, the burden is always on the plaintiff to demonstrate that genuine issues exist for trial.  *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 643-44 (7th Cir. 2006).

Both parties agree that Mohammad does not have direct evidence of discrimination. Accordingly, he must rely on the indirect method of proving discrimination under the familiar burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 896-97 (7th Cir. 2003).

Under the indirect method set forth in *McDonnell Douglas*, Mohammad must first establish a prima facie case of race, national origin, or religious discrimination.  *Keri*, 458 F.3d at 643.  To successfully set forth a prima facie case of discrimination on one of these bases, Mohammad must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the protected class were treated more favorably.  *See Fane*, 480 F.3d at 538 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142

32

(2000)).[3]  Although the Court has recommended that Purdue be granted summary judgment on Mohammad's § 1981 claim based on sovereign immunity, the same prima facie requirements for the Title VII analysis apply to the substantive § 1981 claim as well, and, thus, the following analysis applies to both legal bases for Mohammad's claims of discrimination.  *See id.* (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007)).

If Mohammad establishes a prima facie case of race discrimination, the burden of production shifts to Purdue to articulate a legitimate, nondiscriminatory reason for the employment decision. *Id.* (citing *Reeves*, 530 U.S. at 142).  The employer's burden of production is "quite light," *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999), and if Purdue meets its burden, Mohammad must demonstrate that Purdue's articulated reasons for his termination are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives, *Fane*, 480 F.3d at 538 (citing *Reeves*, 530 U.S. at 143).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### 1.  Prima facie case

Both parties agree that Mohammad meets the first prong of the prima facie case in that he is of Indian national origin and that his religion is Muslim.  They also agree that he suffered an adverse employment action under the third prong of the prima facie case when he was terminated on January 7, 2005.  However, the parties disagree as to whether Mohammad was meeting Purdue's

---

[3] The Seventh Circuit has recently held, in the context of termination, that a plaintiff may alternatively satisfy the fourth element of the prima facie case by showing that "the employer needs to find another person to perform that job after the employee is gone . . . ." *Keys v. Foamex, L.P.*, No. 05-3683, 2008 WL 370922, at * 2 (citing *Pantoja v. AM. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007)).  However, this issue was not briefed before the Court; therefore, the Court will not engage in this analysis.  *Id.* (citing *Pantoja*, 495 F.3d at 846; *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 n.2 (7th Cir. 2007)).

legitimate performance expectations and whether a similarly situated employee was treated more favorably.

a.  Legitimate performance expectations

Purdue argues that Mohammad cannot establish that he was meeting Purdue's legitimate expectations because he would not regularly meet with Meilan to discuss Meilan's research program,  he failed to favorably respond to Meilan's attempts to discuss Mohammad's poor performance, he failed to improve his performance after being counseled by Swihart, his communication with Meilan did not improve despite repeated verbal and written warnings, and he admitted that he did not take steps to improve his communication with Meilan or to establish required meetings with Meilan.  Mohammad responds that his unblemished eighteen-year history with Purdue prior to the conflict with Meilan should be considered, that Meilan had unreasonable expectations of Mohammad's role as lab manager, that Meilan made unreasonable and unjustified demands on Mohammad's time, and that it was Meilan and not Mohammad who refused to accept the reasonable scheduling proposals made by Mohammad.

Mohammad cannot demonstrate that he was meeting Purdue's legitimate performance expectations because he admittedly did not comply with all of the requirements outlined in the written warnings by Swihart, specifically the requirements that he meet with Meilan on a weekly basis and that he improve communications with Meilan.  The record demonstrates that the working relationship between Mohammad and Meilan was strained, apparently as a result of the expectations Meilan had for Mohammad in his role as lab manager, which differed from Mohammad's understanding of his job responsibilities.  Although Swihart was Mohammad's direct supervisor and Meilan did not have the authority to discipline or fire Mohammad, all of Meilan's complaints

34

regarding Mohammad's performance were channeled through Swihart who then took disciplinary action against Mohammad. The record also shows that Meilan was the primary, if not only active, user of the MTPL, and that he made certain requests of Mohammad that were not fulfilled.

First, Meilan repeatedly asked Mohammad to meet with him on a weekly basis in Meilan's office to discuss the progress and any problems in the MTPL. After Swihart discussed Meilan's concerns with Mohammad on numerous occasions and issued a series of warnings, Mohammad still failed to meet with Meilan. The evidence shows that at one point, Mohammad sent an email to all PIs using his lab that he would be available during one hour each week in his office to meet concerning lab issues. Meilan agreed with Mohammad's proposal but still requested that Mohammad meet in Meilan's office to provide oral progress reports on the tasks accomplished in the MTPL. Mohammad responded days later that he respectfully disagreed that he should make an exception for Meilan but that if the scheduled time did not work for Meilan, Mohammad would arrange for another time for Meilan to meet him in Mohammad's office. The next day, after consulting with Swihart about how to respond and at the suggestion of Swihart, Meilan wrote that he considered his request for a weekly meeting with Mohammad in Meilan's office to be reasonable and that "I would like you to come to my office next Tuesday the 12th of October at 10:00 a.m. for us to discuss your recent accomplishments in my lab." Although there is no direct tetimony whether Mohammad attended that meeting, later, on November 4, 2004, Mohammad responded to the October 25, 2004 warning, reiterating that he would arrange to meet with Meilan any other time in Mohammad's office, including evenings and weekends.

Mohammad argues that it was Meilan's fault that a meeting was not established, and argued that Meilan had done this before shortly after Swihart became interim head of the department. The

other occasion referenced by Mohammad is an email exchange that took place on July 29, 2004, related to a proposal by Mohammad to meet with Meilan to discuss a DNA extraction project. In that instance, Meilan first proposed a time for which Mohammad responded that he had a conflict. Mohammad proposed meeting earlier or later the same day proposed by Meilan. Meilan indicated he could not meet earlier but proposed a time in the afternoon for the original proposed day. Mohammad accepted that time. A few minutes later, Meilan emailed that something had come up and asked if they could meet anytime a day earlier than the proposed day. Mohammad's argument that Meilan did not provide an acceptable time for this meeting and that he rejected Mohammad's time for "some unknown reason," is not supported by the documented evidence of this email exchange. The fact remains that Mohammad did not establish meetings with Meilan as required by Swihart despite his understanding that he was required to do so, and Mohammad admits as much in his deposition. Mohammad also stated in his deposition that he did not improve his communication with Meilan although he was explicitly required to improve communications in the written warnings.

Mohammad argues in his brief that he was meeting the legitimate expectations based on the job description that he was given when hired. He claims that Meilan had unreasonable expectations of his responsibilities as lab manager not outlined in the job description and that Meilan treated Mohammad like a technician rather than a lab manager, which were different positions with differing levels of responsibility. Another PI clarified for Meilan that "[Mohammad], or any other lab manager oversees lab operations. They are not research technicians." Other PIs also expressed expectations of lab managers different than those of Meilan, such as Professor Gillespie who saw Mohammad's job as "essentially to maintain equipment, train students on equipment, help purchase

36

new equipment–allocate lab space as needed and maintain the safety aspect of the labs."
Mohammad frequently reiterates that meeting weekly with a PI was not part of his job description
and that none of the other lab managers were required to do so.  Regardless, Swihart, Mohammad's
direct supervisor, directed Mohammad to fulfill these additional requirements requested by Meilan,
and Mohammad failed to fulfill all the requests.  Mohammad did not meet with Meilan when first
asked by Meilan and then when explicitly required to do so by Swihart, his direct supervisor, in a
series of written warnings.

In addition, Mohammad argues that Meilan unjustifiably demanded fifty percent of
Mohammad's time.  Email correspondence in the record shows that Meilan stated that LeMaster,
Swihart's predecessor, had promised him fifty percent of Mohammad's time, although Meilan does
not have any documentary evidence to substantiate a promised percentage of Mohammad's time.
Mohammad also suggests that Swihart did not fully understand the responsibilities of a lab manager
when he directed Meilan to speak to Kremer, another lab manager in the department, to determine
whether Meilan's demands on Mohammad were consistent with the functions of a lab manager.
Instead, Meilan spoke with a PI who confirmed that Meilan's demands on Mohammad were
reasonable.

Mohammad also argues that, although Meilan tried to stifle Mohammad's efforts,
Mohammad worked diligently to perform the tasks under his job description as well as those
assigned by Meilan and Swihart.   Indeed, the record contains evidence of Mohammad's
responsiveness to Meilan's requests.  Mohammad further references what he believes are instances
of Meilan abrogating Mohammad's position as lab manager and assumed the functions himself.  As
detailed fully in the fact section above, these instances include the exchange on August 4, 2004,

regarding the $95 fee for technical assistance; the August 27, 2004 email from Meilan to Swihart indicating that Mohammad's work rearranging lab equipment was comparable to rearranging the chairs on the deck of the Titanic; the exchange around August 30, 2004, in which Meilan asked Mohammad to pick up barrels of liquid nitrogen until a student could obtain a license to drive; the September 4, 2004 order from Meilan for Mohammad to set up a pH meter and image analysis system, which Mohammad agreed to do; Meilan's September 14, 2004 approval of a purchase by Mohammad made with lab money and request that Mohammad provide Meilan with the name of the supplier, catalog number, and cost of each unit prior to placing the order; Meilan's requests that Mohammad perform certain tasks in the lab, which Mohammad was willing to perform; Meilan's October 13, 2004 request that Mohammad pick up 20 pounds of dry ice from a store, which Mohammad did; and the October 21, 2004 exchange regarding the inventory of chemicals and the use of student assistance.

Mohammad further identifies some comments made by Meilan that Mohammad argues downplay Mohammad's accomplishments. First, Meilan emailed Swihart after Mohammad had completed the chemical inventory, writing, "Well, that occurred a lot faster than had been projected." On October 25, 2004, Meilan sent Swihart an email regarding a list of 60 completed tasks that Mohammad had provided to Meilan, commenting, "Quite frankly [Mohammad] should have been embarrassed to include many of the entries. It probably took him longer to type many of them out than to actually perform the task" and that the work was "pure fluff."

Mohammad does admit that certain items requested by students that had been written on the white board had not been ordered by Mohammad because Mohammad had requested, as lab manager, that all requests for orders by students be done via email.

38

Regarding Mohammad's failure to communicate with Meilan, the email evidence of record demonstrates that Mohammad responded to Meilan's emails. Meilan stated in his deposition that Mohammad mostly responded to his email correspondence, and Meilan was unable to produce examples of any emails to which Mohammad failed to respond.

Whether or not Meilan's expectations of Mohammad's responsibilities and time were accurate or reasonable, Meilan nevertheless communicated frequently with Mohammad and then communicated his concerns to Swihart, Mohammad's direct supervisor, who in turn memorialized certain expectations of Mohammad in the form of the written warnings. The written warnings were communicated to Mohammad, and, as admitted in his own deposition testimony, Mohammad did not comply with the requests for meetings and improved communication.

Finally, Mohammad cannot show that his job performance was satisfactory at the time that he was terminated based on the performance expectations articulated in the series of warning letters and the testimony, including his own, regarding his compliance with those requests. Whether or not Mohammad was performing his job satisfactorily prior to the conflict with Meilan in the months leading up to his termination, the proper inquiry by this Court mandates looking at Mohammad's job performance through the eyes of his supervisors at the time of his termination. *Gates v. Caterpillar, Inc.*, – F.3d – , 2008 WL 141814, at *6 (7th Cir. 2008) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but 'whether the employee was performing well at the time . . . '")). Swihart communicated his performance expectations to Mohammad on at least seven occasions, and Mohammad admits that he did not comply with certain of those requests.

39

Accordingly, Mohammad has not met his burden of demonstrating that he was meeting Purdue's legitimate job expectations.  On this basis, the Court recommends that the District Court grant summary judgment on the Title VII and § 1981 claims in favor of Purdue.

b.  Similarly situated employees

Mohammad has identified the other lab managers in the Department of Forestry as the similarly situated employees who received more favorable treatment under similar circumstances, alleging in his Complaint that they were not assigned to perform tasks that were not a part of their job description such as carrying heavy weight and serving as chair of departmental committees. Purdue argues that Mohammad has not identified any similarly-situated employees who were treated more favorably because Marcia Kremer, a fellow lab manager, was required to perform the tasks that Mohammad alleges were discriminatory and demeaning.  In his brief, Mohammad argues that Kremer was not required to meet with her PIs on a weekly basis and that no other lab manager had become an errand boy for a PI like Mohammad had become for Meilan.

A similarly situated employee for purposes of proving discrimination refers to "employees who were 'directly comparable to [the plaintiff] in all material respects.'"  *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005) (citations omitted).  To evaluate whether two employees are directly comparable, a court considers all of the relevant factors, "which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications-provided the employer considered the latter factors in making the personnel decision."  *Id.* at 693 (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)); *see also Fane*, 480 F.3d at 540.  Moreover, "courts do not sit as super personnel

40

departments, second-guessing an employer's facially legitimate business decisions." *Brummett*, 414 F.3d at 692 (quoting *Ajayi*, 336 F.3d at 532).

The lab managers in the Department of Forestry and Natural Resources reported to Swihart, who was their direct supervisor. Different PIs utilized each lab, but the PIs did not have supervisory control over the lab managers. Of the lab managers, Mohammad was the only one with a Ph.D. Based on Mohammad's testimony, at the time of his employment, all the lab managers were native born United States citizens.

In his brief, the only other similarly situated employee for whom Mohammad provides any evidence is Marcia Kremer, another lab manager. There is no evidence or specific argument regarding the responsibilities or treatment of any of the other lab managers in the department. Therefore, the Court considers only Kremer as a similarly situated employee. She is a white female of American national origin. She possessed a bachelor's degree in medical technology and had worked for the University for about 29 years, becoming the lab manager for the genetics lab in 2004. Kremer stated that she considered her job duties similar to those of Mohammad except for the size of the labs that they managed. Kremer testified that, although Swihart is technically her supervisor, she did not deal with him on a daily basis. Rather, she worked with approximately five PIs. She met with the PIs on a monthly basis as a group on a time frame suggested by Kremer.

First, regarding the performance expectations of Mohammad and Kremer, there is no evidence of record regarding the needs or expectations of the PIs working in the genetics lab with Kremer. However, the record establishes that Meilan had specific expectations about the role that Mohammad should play in the management of the MTPL. Therefore, Mohammad cannot establish that he and Kremer or the other lab managers were subject to the same performance standards.

Next, some of Mohammad's allegations of disparate treatment are that he was required to chair a committee, was required to carry heavy loads, specifically the liquid nitrogen, and was made to run errands by Meilan.  In her statement, Kremer stated that she was assigned to chair a committee within the department.  Kremer also ordered and picked up liquid nitrogen for PIs, although they were small barrels.  In his brief, Mohammad does not dispute these requirements of Kremer or argue that other additional responsibilities were required of him that were not required of her.

Mohammad also alleges in his Complaint that no other lab managers were required to work for a specific faculty member or have their time structured by faculty members.  According to Swihart, Mohammad was the only lab manager that Swihart required in writing to report to a PI on a weekly basis.  However, Kremer stated that she worked directly for the faculty PIs, not Swihart, just as Mohammad was working with Meilan.  Notably, Mohammad's work in the MTPL was solely for Meilan because Meilan was the only active PI in that lab, unlike Kremer's experience with multiple PIs working in the genetics lab.

As for the consideration of whether Kremer and Mohammad had the same supervisor, both parties agree that Swihart was the direct supervisor of the lab managers, including Kremer and Mohammad.  However, Mohammad has not offered any evidence that Swihart treated him differently than Kremer when faced with complaints, if any existed, about Kremer's work by a PI. Kremer testified that she worked directly with the PIs that used the genetics lab, rarely interacting with Swihart, just as Mohammad interacted directly with Meilan.  There is no evidence in the record that the PIs using the lab run by Kremer complained to Swihart about her performance or communication in any manner similar to the complaints that Meilan brought to Swihart about

Mohammad.  Therefore, there is no evidence that Swihart treated Mohammad differently than Kremer.

Although Mohammad argues that Swihart delegated his authority over Mohammad to Meilan but did not take similar action with Kremer or any other lab manager, the evidence of record demonstrates the opposite.  As noted, Kremer's primary interaction was with the PIs, just as Mohammad's primary interaction was with Meilan.  Nevertheless, Swihart, as his direct supervisor, did all of the disciplining of Mohammad.  Swihart met with Mohammad to communicate Meilan's concerns and to express expectations, and Swihart issued the written warnings.  Swihart did not delegate this authority to Meilan.

Accordingly, Mohammad has not established that any similarly situated employees not of his protected classes were treated more favorably.  On this basis, the Court recommends that the District Court grant summary judgment on the Title VII and § 1981 claims in favor of Purdue.

2.  Legitimate, non-discriminatory reason and pretext

Even if Mohammad could demonstrate a prima facie case of race discrimination, Purdue has proffered a legitimate, non-discriminatory reason for terminating his employment.  Purdue states in its brief that Mohammad's performance as a lab manager was deemed insufficient by both his peers and the administrators to whom he reported and that when Mohammad was given ample opportunity to correct his performance and comply with relevant policies and directives, he failed to do so.

The burden then shifts to Mohammad to prove that this articulated reason is a pretext for discrimination.  *See Perez v. Illinois*, 488 F.3d 773, 777-78 (7th Cir. 2007).  "A pretext . . . is a deliberate falsehood."  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (citing *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006); *Kulumani v. Blue Cross Blue*

43

*Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("[P]retext means a dishonest explanation, a lie rather than an oddity or an error.")).   "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered."   *Id*. (citing *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)).   The courts do not "sit as a super personnel department to review an employer's business decisions." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000).   "[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee.   Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Gates*, 2008 WL 141814 at *8 (citing *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir.2005); *Ptasznik*, 464 F.3d at 696 ).

There is nothing in the record that demonstrates or supports a finding that Purdue's stated reasons for disciplining and terminating Mohammad were fabrications.   Mohammad has not brought forth any evidence that Meilan's dissatisfaction with Mohammad's work and ability to communicate were lies, that Swihart lied about Meilan's complaints or about Mohammad's failure to comply with the requested performance improvements, or that any of those individuals at Purdue reviewing Swihart's decision to terminate Mohammad did not honestly believe the reasons proffered by Swihart for Mohammad's termination.   As noted above, Mohammad admitted that he did not meet with Meilan and did not make efforts to improve his communication with Meilan.

The evidence of record demonstrates that Meilan communicated with Mohammad prior to informing Swihart of his dissatisfaction with Mohammad and that the various meetings, communication, and disciplinary letters from Swihart and Meilan were gradual, explicit, and constructive.   The discipline spanned a period of approximately six months, and each disciplinary letter from Swihart identified concerns with Mohammad's performance, set goals for Mohammad

44

to achieve, and explained the consequences of a failure to do so.  As discussed in the *prima facie* case above, the disciplinary letters explain the areas of improvement sought by Meilan and Swihart and state that Mohammad did not fulfill their expectations.  Mohammad has not offered any evidence to counter this documentation.

Although Mohammad argues in his brief that the credibility and intent of Meilan and Swihart are crucial issues in this case, citing *Snelling v. Clarian Health Partners, Inc.*, 184 F. Supp. 2d 838, 845 (S.D. Ind. 2002), Mohammad has not offered any evidence to bring into question their credibility or intent.  Mohammad argues that Meilan made false assertions concerning Mohammad's alleged misbehavior and poor performance, that Swihart and Meilan contradict each other regarding these allegations of misbehavior and poor performance, that email correspondence shows that Mohammad complied with all of Meilan's demands, and that Meilan exaggerates what he perceived to be Mohammad's faults.  However, a review of the evidence, such as the actual text of the emails exchanged between Mohammad, Meilan, and Swihart, demonstrates that Meilan was indeed persistent in demanding certain behaviors from Mohammad who ran Meilan's MTPL lab but does not demonstrate an "unjustified and relentless negative pursuit of Mohammad," Pl. Br., p. 6, or an "invidious agenda to bring down Mohammad," *id*., p. 19.

Frequently the malicious intent ascribed to Meilan for a certain event by Mohammad in the briefing of this motion on further scrutiny of the evidence, even viewed in the light most favorable to Mohammad, turns out to be nothing more than garden-variety conversations about scheduling or polite, albeit likely frustrating, micro-managing by Meilan.  For example, in his brief, Mohammad accuses Meilan of "not even [letting] a simple grammatical mistake by Mohammad pass" in an email exchange on September 14, 2004.  Pl. Br., p. 19.  A reading of the emails in this exchange

45

demonstrates that Meilan did not criticize Mohammad's grammar; rather, Meilan simply asked for clarification because it was not clear to Meilan from Mohammad's statement whether Mohammad was going to make the purchase. Mohammad also raises Meilan's email inquiries regarding Mohammad's trip to Nebraska related to Mohammad's responsibilities in the other lab he managed, describing Meilan's email as a "desperate effort to prevent Mohammad from attending a very crucial training conference." *Id.* A reading of the email exchange demonstrates, at most, that Meilan was concerned about the use of Mohammad's time, even if for the ultimate purpose of demanding more of Mohammad's time for Meilan's lab. Similarly, the other examples raised by Mohammad regarding the November 6, 2004 email about "misinformation," the November 8, 2004 email about Mohammad sending a "misleading" email about the time of his departure, and the November 8, 2004 email objecting to Mohammad becoming responsible for the campus green houses, all related to Meilan's ongoing concerns about Mohammad's responsibilities as lab manager, Meilan's right to a percentage of Mohammad's time, and Mohammad's manner of communicating with Meilan. Finally, Mohammad references the email Meilan sent to his wife in which he referred to Mohammad as a "petty little man," which was inadvertently copied to Mohammad. Although this comment was by no means favorable, it does not suggest that Meilan's difficulties with Mohammad's performance stemmed from Mohammad's race, religion, or national origin but rather from their ongoing personality conflict about the management of the MTPL.

The fact that Meilan and Mohammad had different expectations about Mohammad's responsibilities as lab manager and that friction arose as a result of Meilan identifying Mohammad as a technician, rather than a lab manager, without more, is not indicative of the alleged discrimination but rather of a difficult working environment and differences of opinion. There is

no evidence such that a reasonable person could find that Meilan treated Mohammad as he did and

made the demands on Mohammad's performance and time that he did because of Mohammad's race,

religion, or national origin.  Rather, the conclusion to be drawn from Meilan's behavior is that, as

the PI in the MTPL, Meilan wanted to control how the lab was managed.

        As noted above, the Court does not sit as a super personnel department and thus does not

adjudge whether Meilan, Swihart, and Mohammad communicate well, whether Meilan was not

sufficiently sensitive to Mohammad's role as lab manager, whether Meilan micro-managed

Mohammad, whether Meilan had unreasonable expectations for his allocation of Mohammad's time,

whether Swihart chose the best form of discipline, or whether Swihart and Meilan made accurate,

wise, or well-considered employment decisions.  Mohammad is correct that the only source of

complaints against Mohammad came from Meilan, and Purdue does not disagree with Mohammad's

argument that his eighteen-year history with Purdue was clean.  However, Meilan expressed

concerns to Swihart about Mohammad's performance, Mohammad was advised of the concerns,

Mohammad admittedly did not improve his communication with Meilan and did not set up meetings

with him, and Mohammad was terminated.

        In his brief, Mohammad argues that to cover up their discriminatory conduct, Meilan and

Swihart made "outlandish accusations" against Mohammad concerning his behavior.  In the first

letter of reprimand, Swihart included "rudeness" as one of the complaints lodged with Swihart by

Meilan against Mohammad.  When asked in his deposition to cite examples of the rudeness, Swihart

referenced the incident in the hallway in which Meilan alleges that Mohammad turned his back to

Meilan when Meilan said "hi."  Mohammad appears to agree that the situation occurred because he

argues that it did not take place in the MTPL and they were not discussing business.  Meilan testified

47

to other incidents that Meilan believed were rudeness by Mohammad. There is no other evidence confirming these accusations. There is no other evidence in the record of other acts of rudeness to Mohammad by others at Purdue. Mohammad also points to Swihart's belief that Mohammad had not maintained the pH meter when, in fact, Meilan had halted Mohammad's work on the meter to attend to another task. Mohammad argues that these claims were made up to cover Swihart and Meilan's discriminatory conduct. The fact remains that, even if Swihart and Meilan used poor judgment or were even incorrect about Mohammad's performance and behavior, their actions cannot be considered a result of invidious discrimination without proof of pretext, which Mohammad has not demonstrated.

Accordingly, in addition to failing to establish a prima facie case of discrimination based on race, national origin, or religion, Mohammad has not met his burden of proving that Purdue's articulated legitimate, nondiscriminatory reason for terminating his employment was a pretext. In the absence of evidence of pretext, Mohammad's claims of discrimination must fail. Therefore, for these additional reasons, the Court recommends that the District Court grant summary judgment in favor of Purdue on Mohammad's substantive Title VII and § 1981 claims.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment [DE 24].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(B). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have ten (10) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in the waiver of the right to challenge this Recommendation before

either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

So ORDERED this 27th day of February, 2008.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record

49